**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**MAUREEN D. DUPELL,**

        Plaintiff,

**v.**                                             **CIVIL ACTION NO. 3:12-CV-6
(JUDGE GROH)**

**AETNA LIFE INSURANCE
COMPANY,**

        Defendant.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION TO REMAND AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

Plaintiff, Maureen D. Dupell ("Plaintiff"), as a participant in her employer-sponsored

benefit plan, brings a claim pursuant to the civil enforcement provision of the Employee

Retirement Income Security Act ("ERISA"), § 502(a) (29 U.S.C. § 1132(a)) to recover long-

term disability benefits that were denied by the Defendant, Aetna Life Insurance Company

("Defendant"). This matter is currently before the court on Defendant Aetna Life Insurance

Company's Motion for Summary Judgment [Doc. 23], filed on July 9, 2012. The Plaintiff

filed her Response to this Motion for Summary Judgment [Doc. 28] on July 23, 2012. The

Defendant filed a reply thereto [Doc. 29] on July 30, 2012. For the following reasons, this

Court **DENIES** the Defendant's Motion for Summary Judgment [Doc. 23].

Also pending before this Court is the Plaintiff's Motion for Summary Judgment or,

in the Alternative, Motion to Remand  [Doc. 25], filed on July 9, 2012.  Defendant filed its

Response in Opposition to Plaintiff's Motion for Summary Judgment or, in the Alternative,

Motion to Remand [Doc. 27] on July 23, 2012. Plaintiff filed a Reply Memorandum in

Support of her Motion for Summary Judgment [Doc. 30] on July 30, 2012.  For the following

reasons, this Court **DENIES** the Plaintiff's Motion for Summary Judgment or, in the

Alternative, Motion to Remand [Doc. 25].

## II.  Factual Background

Plaintiff is a 58 year-old female residing in Berkeley County, West Virginia. (Joint

Stipulation, [Doc. 22] ¶ 1).  Plaintiff alleges that in 1991, she developed degenerative

disc disease and a ruptured disc with leg pain and weakness.  (Pl.'s Compl., [Doc. 5] ¶

11).  In March 1992, Plaintiff had surgery at John Hopkins Medical Center which

consisted of a laminectomy and discectomy at L4-L5. *Id.*  On October 30, 2004, an MRI

examination of Plaintiff's lumbar spine was conducted which revealed further

degenerative disc disease. *Id.* at ¶ 13*.*

*Social Security Administration's Disability Determination*

On December 22, 2005, the Social Security Disability Administration ("SSA")

determined that Plaintiff was disabled as defined by the Social Security Act and

Regulations, and Plaintiff received an award of Social Security Disability Income

("SSDI") retroactive to March 2, 2004. *Id.* at ¶ 9; A.R. [Doc. 20] 323-26.[1]  The SSA

stated that Plaintiff was "incapable of performing substantial gainful activity" due to

---

[1]References to the Administrative Record refer to the Defendant's bate stamp number located in the bottom right-hand corner of the Administrative Record filed by the Defendant in this Court on May 4, 2012 [Doc. 20].

"discogenic and degenerative disorders of the spine and a depressive disorder." A.R. 324-25. The SSA elaborated on these findings by stating that Plaintiff is "mentally limited to simple, routine, one-two step work" and that Plaintiff could not "perform [her] past relevant work and does not have transferable skills to perform other work within [her] residual functional capacity to perform less than sedentary exertional work." *Id.* at 324.

*Plaintiff's Employment*

In September 2005, Plaintiff was hired as a sales assistant for Dan Ryan Builders. (Joint Stipulation, ¶ 10). Plaintiff's Social Security Disability payment continued during her nine months of trial work, which enabled her to test her ability to work. *Id.* at ¶ 13. Her trial work period ended in June 2006. A.R. 453-55. On March 20, 2006, Plaintiff was hired by K. Hovnanian Companies, L.L.C. ("KHC"). *Id.* at ¶ 2. Plaintiff worked as a sales consultant with a $14,000 annual base salary, plus commissions. (Pl.'s Compl., ¶ 16). As a sales consultant for KHC, Plaintiff "secure[d] contracts for the purchase of new homes, assist[ed] in securing financing, help[ed] choose exterior color selections for the new home, if applicable, while being [a] liaison between the Community Manager/Community and the public." A.R. 435. The KHC sales consultant position required the following physical job duties:

> [T]he Associate is regularly required to sit at a desk, use fingers to operate a computer keyboard, reach for telephone or books with hands and arms, and talk and hear on the telephone while communicating with others. The Associate is regularly required to stand and walk around a sales office or construction site. The Associate must occasionally lift and/or move up to 10 pounds. Specific vision abilities required by this job include close vision and ability to adjust focus.

3

*Id.* at 437.

As a KHC employee, Plaintiff enrolled in KHC's long-term disability plan. (Joint Stipulation, ¶ 6). Aetna served as the underwriter and claims administrator for KHC's Long-Term Disability Plan (the "Plan"), which is an employee welfare benefit plan as defined by ERISA. *Id.* at ¶ 4-5.  While working at KHC, Plaintiff applied for and was placed on short-term disability until April 30, 2008 under KHC's Short Term Disability Plan. *Id.* at ¶ 12.  Because of Plaintiff's substantial work at KHC, she was not entitled to SSDI payments from October 2006 through September 2007.  *Id.* at ¶ 13. Plaintiff's SSDI payments were reinstated by a letter dated November 2, 2007. *Id.* at ¶ 14.

*Plaintiff's Long-term Disability Benefits Claim*

On March 11, 2008, Plaintiff applied for long-term disability benefits under the Plan. *Id.* at ¶ 15.  In support of her application, Plaintiff also submitted a Physician Statement prepared by Dr. J.A. Burgess which stated that the Plaintiff could not lift, that the Plaintiff could not sit, stand, walk, or drive for more than thirty minutes at a time, and that a low-stress environment was preferred for the Plaintiff. A.R. 288.  According to the Plan, a plan participant is disabled if "[f]rom the date you first become disabled and until Monthly Benefits are payable for 24 months . . . if: you are not able to perform the material duties of your own occupation solely because of: disease or injury; and your work earnings are 80% or less of your adjusted predisability earnings." *Id.* at 319.    On March 26, 2008, Plaintiff was approved for long-term disability benefits under the aforementioned Plan definition and began receiving benefits pursuant to the Plan. (Joint Stipulation, ¶ 16).

After Plaintiff's initial approval for long-term disability benefits, she had multiple

4

MRIs.  On February 17, 2009, an MRI of Plaintiff's spine revealed further degeneration.
A.R. 268.  On November 5, 2009, Plaintiff underwent a "fluoroscopic-guided, left L5
block and multilevel lateral branch block as a diagnostic evaluation in preparation for
possible radiofrequency denervation" by Dr. Mayo Friedlis. *Id.* at 294.  The next day, on
November 6, 2009, Dr. Mayo Friedlis conducted a physical examination of the patient
and found that she "had reduced lumbar range of motion with associated tenderness"
and felt that she also had "left sacroiliitis with a lumbar post laminectomy syndrome and
a left L5 radiculopathy and multilevel lumbar disc disease."  *Id.*

*Plaintiff's Long-term Disability Renewal*

After receiving long-term disability benefits for the first twenty-four months, Aetna
reviewed Plaintiff's application for long-term disability benefits under the Plan's second
disability definition: a plan participant is disabled if "[a]fter the first 24 months that any
Monthly Benefit is payable during a period of disability . . . if you are not able to work at
any reasonable occupation solely because of: disease; or injury." *Id.* at 319.  The Plan
defines reasonable occupation as "any gainful activity for which you are; or may
reasonably become; fitted by; education; training; or experience; and which results in; or
can be expected to result in; an income of more than 80% of your adjusted predisability
earnings."  *Id.* at 190.  On January 20, 2010, as part of Plaintiff's renewed application
for long-term disability benefits, the Aetna Attending Physician Statement form was
completed by Dr. Sylvia Cruz, D.O., Pain Management Specialist. Dr. Cruz listed the
Plaintiff's diagnoses as lumbar spondylosis with lumbar radiculopathy;  Dr. Cruz opined
that Plaintiff had no ability to work. *Id.* at 288.

On March 9, 2010, Dr. Lawrence Blumberg, M.D., was assigned to perform a

Physician Review by Aetna, and Dr. Blumberg had a peer-to-peer consultation with Dr. Cruz on March 10, 2010. *Id.* at 378.  Dr. Blumberg stated that he was told by Dr. Cruz that "the [Plaintiff] could perform any occupational activities provided she was allowed to change positions." *Id.*  On March 30, 2010, Aetna denied Plaintiff's application for long-term disability benefits under the Plan's above disability definition, and the denial was effective April 1, 2010. (Joint Stipulation, ¶ 17).

*Plaintiff's Appeal of Decision to Aetna*

Plaintiff timely appealed Aetna's denial of her long-term disability benefits.  *Id.* As part of Plaintiff's appeal, Dr. Cruz sent a letter to Aetna Disability-Workability Appeals dated May 10, 2010, in which Dr. Cruz sought to clarify her March 10, 2010 peer-to-peer conversation with Dr. Blumberg.  A.R. 338. In her letter, Dr. Cruz noted that "as time has progressed [the Plaintiff's] functionality has significantly decreased since her disability determination, and she is not able to perform these functions as well as she did when she was determined to be disabled." *Id.*

On May 11, 2010, the Plaintiff underwent another MRI. *Id.* at 332.  The Plaintiff's clinical history stated she was a "56-year-old woman with low back and left lower extremity symptoms, progressively worsening.  Patient has history of previous surgery in 1992." *Id.*  Doctor Rees concluded that the MRI showed "a degenerative disc disease and spondylosis greatest on the left at L5-S1.  Clinical correlation for a left greater than right L5 radiculopathy suggested." *Id.*

On June 18, 2010, the Plaintiff underwent a comprehensive and detailed independent medical evaluation by Dr. Alex Ambroz; he reviewed her medical history, including her medical records.  *Id.* at 309-317.  As part of her appeal, Plaintiff submitted

6

Dr. Ambroz's report of the evaluation. *Id.* at 305-317. Dr. Ambroz concluded that "[a]s a result of her medical problems she is permanently and totally disabled. She fully meets the terms of Aetna's permanent disability."*Id.* at 313.

On September 20, 2010, as part of another physician review performed by the Defendant, Dr. Richard S. Kaplan spoke to Dr. Friedlis, a Pain Management Specialist. *Id.* at 295. Dr. Kaplan's report indicated that "[Dr. Friedlis] reports that given [the Plaintiff's] severe pain she would not have been able to work at all during the period under review." *Id.* In this report, Dr. Kaplan stated that "[o]verall the medical records do not support any functional assessment or diagnosis or objective finings [sic] which would indicate an inability of the claimant to perform any work or her usual occupation as per the available job description. There is essentially no functional testing data at all." *Id.* Furthermore, in a supplemental physician review dated October 6, 2010, Dr. Kaplan found that "a more quantitative validation of this claimant's functional abilities would certainly be appropriate. There might reasonably be some difference in professional judgment regarding the exact level of restrictions/limitations at which this claimant is able to work . . . ." *Id.* at 279.

On December 16, 2010, Aetna affirmed its denial of Plaintiff's application for long-term disability benefits under the Plan, thereby exhausting all of Plaintiff's administrative remedies under the Plan. (Joint Stipulation, ¶ 18).

### III.  Procedural Background

Plaintiff filed her Complaint [Doc. 5] on January 23, 2012. On February 14, 2012, the Defendants filed a Motion to Strike and Partial Motion to Dismiss [Doc. 7]. On February 29, 2012, the Plaintiff filed a Response in Opposition to the Defendants' motion [Doc. 12],

7

and on March 8, 2012, the Defendants filed a Reply to the Plaintiff's Response [Doc. 14]. Accordingly, this Court found that, "Aetna did reserve discretionary authority to determine eligibility for benefits, and . . . the applicable standard of review for this matter is abuse of discretion standard." *See* (Order Granting Defs.' Mot. to Strike and Granting Defs.' Partial Mot. to Dismiss, [Doc. 21] at 13). Additionally, this Court granted the Defendants' Motion to Dismiss K-Hovnanian Companies, LLC as a party defendant to the action. *Id.* at 16.

On July 9, 2012, the Defendant Aetna Life Insurance Company filed a Motion for Summary Judgment [Doc. 23].   Also on July 9, 2012, the Plaintiff filed a Motion for Summary Judgment, or in the Alternative, Motion to Remand [Doc. 25].   On July 23, 2012, the Defendant filed its Response in Opposition to Plaintiff's Motion for Summary Judgment, or in the Alternative, Motion to Remand [Doc. 27].   Also on July 23, 2012, the Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment [Doc 28].   On July 30, 2012, the Defendant filed a Reply in Support of its Motion for Summary Judgment [Doc. 29].   Also on July 30, 2012, the Plaintiff filed a Reply to the Defendant's Response to Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion to Remand [Doc. 30]. Accordingly, this Court now considers the motions for summary judgment filed by the Defendant Aetna Life Insurance  [Doc. 23] and by the Plaintiff Maureen D. Dupell [Doc. 25]. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, ("ERISA").

### IV.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment.  *See* FED. R. CIV. P. 56.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir. 1983) ("The court is not permitted to resolve issues of material facts on a motion for summary judgment–even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215 (1985). A motion for summary judgment should be denied "if the evidence is such that conflicting inferences may be

drawn therefrom, or if reasonable men might reach different conclusions." ***Phoenix Sav.
& Loan, Inc. v. Aetna Cas. & Sur. Co.***, 381 F.3d 245 (4th Cir. 1967); *see also **Anderson***,
477 U.S. at 253 (noting that "[c]redibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury functions, not those of a
judge.").

## V.  Discussion

### A. Standard of Review under ERISA

#### 1. Abuse of Discretion

 As held by a previous Order of this Court, the proper standard of review in this
case is abuse of discretion.  (Order Granting Defs.' Mot. to Strike and Granting Defs.'
Partial Mot. to Dismiss, p. 13).  The Fourth Circuit has explained that "[u]nder this
deferential standard, the administrator or fiduciary's decision will not be disturbed if it is
reasonable, even if this court would have come to a different conclusion independently."
 ***Ellis v. Metro. Life Ins. Co.***, 126 F.3d 228, 232 (4th Cir. 1997).  To be reasonable, the
decision must be "the result of a deliberate, principled reasoning process and [ . . . ]
supported by substantial evidence."  *Id. (*quoting ***Brogan v. Holland***, 105 F.3d 158, 161
(4th Cir. 1997)).  *See also **Williams v. Metro. Life Ins. Co.***, 609 F.3d 622, 630 (4th Cir.
2010) (plan administrator's decision is reasonable if it is "the result of a deliberate,
principled reasoning process and if it is supported by substantial evidence."). Whether
the Defendant abused its discretion in denying the Plaintiff long-term disability benefits
depends upon the Defendant's decision-making process: The Defendant's decision
must be the product of a principled reasoning process and supported by substantial

evidence.  In determining the reasonableness of a plan administrator's discretionary

decision, the Fourth Circuit has outlined a list of non-exclusive factors that may be

considered including:

> (1) the language of the plan; (2) the purposes and goals of
> the plan; (3) the adequacy of the materials considered to
> make the decision and the degree to which they support it;
> (4) whether the fiduciary's interpretation was consistent with
> other provisions in the plan and with earlier interpretations of
> the plan; (5) whether the decisionmaking process was
> reasoned and principled; (6) whether the decision was
> consistent with the procedural and substantive requirements
> of ERISA; (7) any external standard relevant to the exercise
> of discretion; and (8) the fiduciary's motives and any conflict
> of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 355, 342-43

(4th Cir. 2000); *see also Donnell v. Metro. Life Ins. Co.*, 165 Fed. Appx. 288, 294 n.6

(4th Cir. 2006) (noting that the **Booth** factors are "more particularized statements of the

elements that constitute a 'deliberate, principled reasoning process' and 'substantial

evidence'").

### 2. Conflict of Interest

The Defendant has a structural conflict of interest because it was responsible for

both evaluating and paying claims. (Defs.' Mot. to Strike and Partial Mot. to Dismiss,

[Doc. 7], ¶ 2). The Supreme Court held this conflict of interest does not alter the

standard of review; rather, the presence of such a conflict is "but one factor among

many that a reviewing judge must take into account." *Metro. Life. Ins. Co. v. Glenn*,

554 U.S. 105 (2008).  The Fourth Circuit stated that a "structural conflict of interest

should not have a significant role in the analysis" where the administrator "was not

11

inherently biased in making its decision." **Williams**, 609 F.3d at 632. In *Williams*, the plan administrator, MetLife, had a structural conflict of interest because it "serve[d] in the dual role of evaluating claims for benefits and of paying benefit claims . . . ." *Id.* However, the structural conflict of interest did not play a significant role in the analysis because "MetLife's initial finding of disability, its payment of longterm disability benefits for almost two years, and its referral of its termination decision to two independent doctors" suggested that it was "not inherently biased in making its decision."

Here, it is undisputed that the Defendant both insures the plan and administers it**.** (Defs.' Mot. to Strike and Partial Mot. to Dismiss, [Doc. 7] ¶ 2).  Like *Williams*, where the Fourth Circuit found no inherent bias in the decision-making process because MetLife paid long-term disability benefits for almost two years and referred the termination decision to two independent doctors, this Court also **FINDS** no inherent bias in Aetna's decision-making process.  The Defendant had four physicians review the claim file, including review by independent physicians through the MLS company, which provides independent medical evaluations, peer review services, and functional capacity evaluations.  Additionally, the Defendant paid long-term disability benefits for the first two years.  Therefore, this is simply a factor that is taken into account in determining the reasonableness of the Defendant's decision, and it is not, by itself, determinative of the reasonableness of its decision.  Additionally, because the Defendant was not inherently biased in making its decision, the structural conflict of interest does not play a significant role in the analysis.

**B.    Genuine Issues of Material Fact Exist Regarding Whether Aetna's Denial
       was  Reasonable**

The Plaintiff's and the Defendant's Motions for Summary Judgment fail to meet
the summary judgment standard because there are genuine disputes of material facts
regarding whether the Defendant's decision to deny long-term disability benefits was  a
reasonable one.  To be reasonable, a decision must be the product of a deliberate,
principled reasoning process and supported by substantial evidence.

**1.    A Question of Fact Exists as to Whether Aetna's Decision is the
        Product of a Deliberate, Principled Reasoning Process**

Plaintiff argues that Defendant did not sufficiently weigh the SSA finding; thus,
the decision is not the product of a deliberate, principled reasoning process.  Plaintiff
contends that the definition of disability under the long-term disability Plan is similar to
the analogous definition used by the SSA in making its disability determinations. (Pl.'s
Mem. of Law in Opp. to Aetna Life Ins. Co.'s Mot. for Summ. J. [Doc. 28] p. 8-9].   The
Plaintiff continues by stating that Defendant "did not consider the Social Security
Administration's disability finding and discounted it."  *Id.* at 9.  Defendant argues that it
"thoughtfully determined that the SSA decision from December 22, 2005 was not
controlling." (Def.'s Mot. for Summ. J. [Doc. 23] p. 20).  Defendant claims it
distinguished the SSA's disability determination because "the information that was relied
on to approve your claim for [SSDI] benefits differs significantly from the information we
now have concerning your claim." *Id.*

Social security disability awards are not binding on ERISA plan administrators;
however, "SSA determinations are not worthless, either." ***Dickens v. Aetna Life. Ins.***

13

*Co.*, Civ. No. 2:10-CV-88, 2011 WL 1258854 (Mar. 28, 2011).  Whether the finding by the SSA is given greater weight depends on the similarity of the "disability" definitions of the agency and Aetna's plan. *See Elliott*, 190 F.3d at 607 (noting the consideration of the SSA's finding "depend[s], in part, on the presentation of some evidence that the 'disability' definitions of the agency and Plan are similar.").  Therefore, if the disability standards for social security and the plan are not sufficiently similar, then courts should not consider an SSA award in an ERISA case.  *See Pipenhagen v. Old Dominion Freight Line, Inc. Emp. Benefit Plan*, 395 F. App'x 950, 957-58 (4th Cir. 2010) (unpublished); *Whitten v. Hartford Life Grp. Ins. Co.*, 247 F. App'x 426, 429 (4th Cir. 2007) (unpublished) (affirming the district court's decision that the SSA's disability determination should be "discounted . . . due to the differing definitions of disability used by SSA and the Plan.").  However, if the SSA's disability definition and the Plan's corresponding disability definition are "sufficiently similar, a plan administrator's failure to consider the SSA award in making the Erisa plan decision is an abuse of discretion." *Dickens*, 2011 WL 1258854 at *3 (citing *Crouch v. Siemens Short-Term Disability Plan,* 662 F. Supp. 2d 553, 561 (S.D.W. Va. 2009) (plan administrator's failure to consider SSA award where the plan and SSA disability definitions were similar was an abuse of discretion).  Indeed, if the plan and SSA disability definitions are sufficiently similar, then "the plan administrator must afford the SSA decision 'significant weight.'" *Dickens*, 2011 WL 1258854 at *3 (citing *Hines v. Unum Life Ins. Co. of Am.*, 110 F. Supp. 2d 458, 468 (W.D. Va. 2000) (plan administrator "should have given the [SSA]'s findings significant weight.")).

14

### a. The Disability Definitions are Similar

The long-term disability benefits Plan administered by Aetna contains a disability definition that is very similar to the SSA's relevant definition.  The Plan's disability definition that is relevant to this case considers an individual disabled if "[a]fter the first 24 months that any Monthly Benefit is payable during a period of disability . . . if you are not able to work at any reasonable occupation solely because of disease; or injury." A.R. 319.  Reasonable occupation is defined as "any gainful activity for which you are; or may reasonably become; fitted by; education; training; or experience; and which results in; or can be expected to result in; an income of more than 80% of your adjusted predisability earnings." *Id.* at 190.

The Social Security Administration's corresponding definition provides that a disability is "the inability to do any substantial gainful activity by reason of any medical determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work or any other substantial gainful work that exists in the national economy." **20 C.F.R. § 404.1505** (2012).

Upon examining the Plan's disability definition and the SSA's disability definition, they appear to be very similar.  First, both require that an impairment, illness, or injury cause the claimant's inability to work.  Second, such an illness, injury or impairment must make the claimant unable to perform the tasks required of the claimant's past work or of a different reasonable occupation or substantial gainful work.  Aetna's plan defines "reasonable occupation" as "any gainful activity"–mirroring the phrase used in the SSA's

15

disability definition "the inability to do any substantial gainful activity."  Indeed, the definitions–though not identical in terms of their phrasing–are sufficiently similar as to require the Defendant to meaningfully weigh the SSA's disability determination.  *See* *Dickens*, 2011 WL 1258854, *3 (finding that Aetna's LTD plan's totally disabled definition was sufficiently similar to the SSA's totally disabled definition and noting three similar components in both definitions: causal, impairment, and scope).  Accordingly, the Court **FINDS** the two definitions similar such that the SSA determination was entitled to substantial weight.

> *b. Question of Fact Exists as to Whether Aetna Meaningfully Weighed the SSA Award*

Because the Plan's disability definition and the SSA's analogous disability definition are found to be sufficiently similar, the Defendant was required to "meaningfully weigh" the social security disability benefit award before making its disability determination.  *Dickens,* 2011 WL 1258854, *4.   Here, a question of fact exists as to whether the Defendant has substantial conflicting evidence to support their determination to give little to no weight to the SSA's disability determination.  Although the Defendant contends that it meaningfully weighed the SSA's disability determination, in the Defendant's denial letter to the Plaintiff, it discounted the disability determination in one sentence "[t]he review shows that the information that was relied on to approve your claim for SSD benefits differs significantly from the information we now have concerning your claim."  A.R. 171.   Additionally, a one-sentence dismissal of the SSA disability determination seems suspect when "an administrator receives reimbursement because of an SSA finding of disability."  *Pauley v. Hartford Life & Acc. Ins. Co.*, 2:09-

16

CV-896, 2010 WL 2836746, *7 (S.D.W. Va. July 20, 2010) (citing **Calvert v. Firstar Fin., Inc**., 409 F.3d 286, 294–95 (6th Cir.2005) ("[A] decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation." (internal quotation marks omitted)). *See also* **Crouch v. Siemens Short–Term Disability Plan**, 662 F. Supp. 2d 553, 561 (S.D.W. Va. 2009) (remanding to plan administrator where administrator "did not review the SSA's award of benefits—an award which has at least some evidentiary significance even in the absence of substantive medical findings by the SSA"); **Thomas v. ALCOA Inc**., No. RDB–07–1670, 2008 WL 4164156, * 13 (D. Md. Sept.5, 2008) ("While Alcoa is not bound by the Administrative Law Judge ..., its findings should have been weighed by the company as relevant evidence."); **Hines v. Unum Life Ins. Co. of Am**., 110 F. Supp. 2d 458, 468 (W.D. Va.2000) ("While Unum is not bound in any way by the determinations of the ALJ, it should have at least considered those findings as relevant evidence."). In this case, the Defendant embraced the SSA determination in order to demand reimbursement of a portion of the benefits previously paid to the Plaintiff. A.R. 194-95. In a letter to the Plaintiff demanding reimbursement, the Defendant stated "[w]e have been advised that you have been awarded Primary Social Security Disability Income (SSDI) benefits in the amount of $2,116.00 per month effective October 1, 2007. Your STD and LTD plans require that we offset your STD and LTD benefits by the amount of your Social Security benefit." *Id.* The Defendant was reimbursed $35,030.10 for a portion of the benefits paid. *Id.* at 341-42. Despite this reimbursement to the Defendant based on the SSA's

17

disability finding, it is unclear whether the Defendant considered the reasoning behind the SSA's disability determination and whether the Defendant properly discounted the determination.  Thus, it is ultimately a question of fact as to whether the Defendant properly weighed and subsequently discounted the SSA's disability determination.

### 2.   A Question of Fact Exists as to Whether Aetna's Decision is Supported by Substantial Evidence

There is a question of material fact as to whether substantial evidence supports the Defendant's conclusion that the Plaintiff is not totally disabled under the Plan's definition.  The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance ." **LeFebre v. Westinghouse Elec. Corp.**, 747 F.2d 197 (4th Cir. 1984) (quoting **Laws v. Celebrezze**, 368 F.3d 640, 642 (4th Cir. 1966)), *overruled by implication on other grounds by* **Black & Decker Disability Plan v. Nord**, 538 U.S. 822 (2003); *see also* **United Seniors Ass'n v. Social Sec. Admin.**, 423 F.3d 397, 404 (4th Cir. 2005); **Stup v. UNUM Life Ins. Co. of Am.**, 390 F.3d 301, 308 (4th Cir. 2004) (noting that voluminous documents of medical records satisfied Plaintiff's "initial burden of submitting proof that she . . . was entitled to long-term benefits under the ERISA plan" and ultimately holding the plan administrator did not have substantial evidence to support denial of benefits).  Here, reasonable minds could differ in regard to the following issues: the interpretation of the objective medical findings, such as the MRIs and the physicians' opinions regarding the Plaintiff's ability to work.

### a. Disputes Regarding the Objective Medical Findings

Objective medical evidence of total disability, such as X-rays, test results, or MRI reports, are persuasive as substantial evidence of disability.  *See* **Hensley v. Int'l Bus. Mach. Corp.**, 123 Fed. Appx. 534, 538 (4th Cir. 2004) (affirming defendant's denial of benefits because the "record is largely devoid of *objective* medical evidence of total disability, such as x-rays, test results or MRI reports" and plaintiff merely relied on opinion of treating physician); **Simmons v. Prudential Ins. Co. of Am.**, 564 F. Supp. 2d 515, 524 (E.D.N.C. 2008) (same).  The opinions of the Plaintiff's treating physicians and the opinions of the Defendant's physician reviewers provide a stark contrast.  The Plaintiff's treating physicians relied on numerous MRI images in making their diagnosis, and the MRI images were also included in the Plaintiff's appeal of the Defendant's denial of her long-term disability benefits.  An MRI from May 11, 2010, stated the Plaintiff's clinical history of "56-year-old woman with low back and left lower extremity symptoms, progressively worsening.  Patient has history of previous surgery in 1992." A.R. 332.  The same MRI resulted in Doctor Rees's following conclusion, "[t]here is a degenerative disc disease and spondylosis greatest on the left at L5-S1. Clinical correlation for a left greater than right L5 radiculopathy suggested." *Id.*  Additionally, Dr. Ambroz reviewed the Plaintiff's medical records, including the aforementioned MRI, and he determined that "[a]s a result of her medical problems she is permanently and totally disabled.  She fully meets the terms of Aetna's permanent disability." *Id.* at 313.  In reviewing this MRI, Aetna referred the Plaintiff's file for review to an Internal Medicine physician. *Id.* at 173.  However, Aetna's reviewing physician noted that the Plaintiff's

19

"EMG studies showed chronic L5 radiculopathy, but did not document[ ] correlating physical examination abnormalities that would support your inability to perform any occupation." *Id.* at 174.   Dr. Kaplan also disagreed with Dr. Ambroz's conclusion stating that "the underlying data upon which that conclusion is based does not support such a level of impairment."  *Id.* at 283.  Thus, it appears there is a genuine question of fact regarding the analysis of the MRIs performed, the connection between the Plaintiff's alleged total disability, and the weight to be given this objective evidence.

        *b.  Disputes as to Ability to Work*

There is a substantial disagreement regarding Plaintiff's abilities to perform any job, specifically a sedentary position.  The Plaintiff's own treating physician, Dr. Cruz, concluded that the Plaintiff had "no ability to work." *Id.* at 288; 426.  Additionally, Dr. Ambroz, who completed a history and physical of Ms. Dupell, stated that she "appear[ed] in chronic pain", had "decreased ranges of motion of the lumbar spine", and she "could not walk on her heels and toes without difficulty/pain" nor "squat and arise." *Id.* at 311-12.  Dr. Ambroz concluded that she "has significant chronic pain to her low back and left side . . . ha[s] decreased ranges of motion of the lumbar spine associated with decreased sensation, reflex changes, and weakness in both legs" ; thus, Dr. Ambroz found her to be "permanently and totally disabled.  She fully meets the terms of Aetna's permanent disability." *Id.* at 313.

    However, the Defendant argues that Dr. Cruz's Capabilities and Limitations Worksheet reveals that she could *possibly* work because the Plaintiff could *occasionally* kneel, pull, push, reach above her shoulder, could do forward reaching, carrying, bending, and twisting. *Id.* at 428.  In order to occasionally be able to do an activity, the

Plaintiff must be able to perform such activities between 1-33% of the day.  *Id.*  Thus, a question of fact exists as to whether the Plaintiff can perform such activities only one percent of the day or thirty-three percent of the day.  Additionally, a question of fact exists as to whether being able to complete these activities 1-33% of the day enables one to "work at any reasonable occupation."  Last, it is disputed whether this Capabilities and Limitations Worksheet constitutes substantial evidence supporting Aetna's denial of benefits even though it conflicts with Dr. Cruz's other opinions regarding the Plaintiff's ability to work.

Additionally, the Defendant insists that the Plaintiff's alleged ailments do not prevent her from performing any occupation; specifically, the Defendant had a Vocational Rehabilitation Consultant review Plaintiff's claim which concluded that she could have the following "gainful occupations" in her "geographical area" such as: "Manager, Benefits; Manger [sic], Employment Agency; Manager, Department; Business Representative; [and] Human Resources Manager." *Id.* at 191.  Also, one of the Defendant's physician reviewers–Dr. Blumberg–conducted a peer-to-peer consultation with Dr. Cruz, the Plaintiff's treating physician.  Dr. Blumberg reported that during this peer-to-peer consultation, Dr. Cruz stated that the Plaintiff "could perform any occupational activities provided she was allowed to change positions." *Id.* at 378.  This alleged admission is a stark contrast to Dr. Cruz's other conclusions that the Plaintiff had "no ability to work" and that she had "intolerance to prolonged periods of standing, sitting or walking [for] greater than 15 minutes."  *Id.* at 428.

However, the Plaintiff argues that Dr. Blumberg's notes from his peer-to-peer consultation with Dr. Cruz on March 10, 2010 mischaracterizes his conversation with Dr.

Cruz. Dr. Blumberg indicates that the Plaintiff could perform any occupational activities as long as she was allowed to change positions; however, in a follow-up letter by Dr. Cruz, she states that the Plaintiff's "functionality has significantly decreased since her disability determination, and she is not able to perform these functions as well as she did when she was determined to be disabled." *Id.* at 338. Additionally, Dr. Cruz points out that she advised Dr. Blumberg that the Plaintiff "had a difficult time sitting, standing or laying down greater than 10 minutes. [She] has to stand if sitting, if sitting may have to stand or lay down." *Id.* Dr. Cruz also voiced her concern as to the Plaintiff's employability when she must change positions in ten minute intervals. *Id.* at 174. Thus, there is a disputed issue of material fact regarding whether the Defendant's denial is supported by substantial evidence and whether the Defendant has sufficient conflicting evidence to discount the Plaintiff's evidence, specifically with regard to Dr. Cruz's opinion regarding the Plaintiff's ability to work[2]. Therefore, the trier of fact must determine whether AETNA relied on substantial conflicting medical evidence in denying coverage, based on the evidence that was before Aetna at the time of making its decision. *See **Bernstein v. CapitalCare, Inc.**,* 70 F.3d 783, 787 (4th Cir. 1995) (noting that when determining whether a plan administrator's decision is reasonable, it is "based on the facts known to [the administrator] at the time.").

---

[2]However, a plan administrator "does not act unreasonably by denying benefits if the record contains 'conflicting medical reports.'" *Id.* (citing **Elliott v. Sara Lee Corp.**, 190 F.3d 601, 606 (4th Cir. 1999)). Also, this Court is not stating that a treating physician's opinion must be given more weight; rather, it is a question of fact to weigh and determine the credibility of the multiple conflicting physicians' opinions. *See **Black & Decker Disability Plan v. Nord**,* 538 U.S. 822, 834 (2003) (holding that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician" but that plan administrators are not required "automatically to accord special weight to the opinions of a claimant's physician.").

Because there are numerous genuine issues of material fact which conflicting inferences may be drawn from the evidence and reasonable men may reach different conclusions, the Plaintiff's Motion for Summary Judgment **[Doc. 25]** and the Defendant's Motion for Summary Judgment **[Doc. 23]** are both **DENIED.**

### C. Remand is Inappropriate in this Case

In reviewing a plan administrator's decision under the abuse of discretion standard, "an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time." ***Elliott***, 190 F.3d at 608-09 (quoting ***Sheppard & Enoch Pratt Hosp.***, 32 F.3d 120, 125 (4th Cir. 1994).  Remand is proper when the district court believes the administrator lacked adequate evidence on which to base a decision.  ***Elliott***, 190 F.3d at 609 (citing ***Berry v. Ciba-Geigy***, 761 F.2d 1003, 1008 (4th Cir. 1985)).

However, the Fourth Circuit has clearly stated that remand should be used sparingly.  ***Elliott****,* 190 F.3d at 609.  In *Elliott,* the claimant stated that the Plan Administrator and Appeals Committee had an obligation to secure additional evidence, such as a report from a vocational consultant to determine what jobs she could possibly perform, prior to making its disability determination. *Id.*  Therefore, the claimant argued that the Appeal Committee made its decision based on an insufficient record and was not a reasonable decision. *Id.*  The Defendant argued that the Plaintiff beared the burden of proving her disability under the Plan and the Plaintiff was free to supplement the record for her appeal; thus, the Defendant claimed it had no obligation to retrieve additional information.  *Id.*  Because the Plaintiff had the burden of proving her disability

and the ability to supplement the medical records before the Appeal Committee, the Fourth Circuit held that remand was not necessary and that the claimant could not prevail on the argument that the Appeal Committee had "insufficient evidence to make a reasoned decision." *Id.*

The Fourth Circuit has outlined two situations where remand is "most appropriate." *Id.* at 609. First, "where the plan itself commits the trustees to consider relevant information which they failed to consider." *Id.* (quoting ***Berry***, 761 F.2d at 1008). Second, "where [the] decision involves 'records that were readily available and records that trustees had agreed that they would verify.'" *Id.* Additionally, a district court "may exercise its discretion to remand a claim 'where there are multiple issues and little evidentiary standard to review.'" ***Elliott***, 190 F.3d at 609 (quoting ***Quesinberry v. Life Ins. Co. of N.A.***, 987 F.2d 1017, 1025 n.6 (4th Cir. 1993) (en banc)).

The Plaintiff argues that remand is appropriate because the administrator lacked adequate evidence on which to base a decision. (Pl. Mot. for Summ. J., [Doc. 26] ¶ 21). Specifically, the Plaintiff argues that the Defendant should have ordered a functional capacity evaluation and reviewed the evaluation prior to denying her long-term disability benefits. *Id.* at ¶ 22. However, "a plan administrator is under no duty to secure specific forms of evidence." ***Elliott***, 190 F.3d at 609. This was the Plaintiff's burden, and Defendant permitted her to supplement her file during the review process. A.R.188-192. Additionally, there is adequate evidence in the record on which to base *a* decision.[3]

---

[3]Although there is adequate evidence in the administrative record on which to base a decision regarding the Plaintiff's qualification for long-term disability benefits, a genuine issue of fact remains regarding whether the Defendant's denial was a reasonable decision under the abuse of discretion standard, based upon the information the Defendant had before it at the time it rendered its decision.

24

Defendant listed forty-one documents and other evidence that were in the Plaintiff's claim file for review, and the Defendant enlisted independent peer physicians to review her claim.  *Id.* at 171-75.  Therefore, there is ample adequate evidence that the Defendant could base *a* decision on in denying the Plaintiff's long-term disability benefits.  Thus, remand is inappropriate in this case.

### VI. Conclusion

For the foregoing reasons, this Court hereby **DENIES** the Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion to Remand and **DENIES** the Defendant's Motion for Summary Judgment.

The Court will enter a Scheduling Order shortly hereafter the entry of this Order that will set dates for the upcoming bench trial.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: January 24, 2013

GINA M. GROH
UNITED STATES DISTRICT JUDGE